IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
November 14, 2017 Session

## STATE OF TENNESSEE v. RALPH ALAN STANLEY

**Appeal from the Criminal Court for Davidson County**
**No. 2014-B-1551     Steve R. Dozier, Judge**

_____

### No. M2016-02546-CCA-R3-CD

_____

The Defendant, Ralph Alan Stanley, was convicted of aggravated assault after a jury trial and was sentenced to ten years of supervised probation. The Defendant appeals his conviction, asserting that he is entitled to a new trial because the evidence was insufficient to support the verdict. He also contends that the trial court erred in denying a motion to suppress, in allowing evidence of text messages and other bad acts, in allowing evidence produced in violation of the rules governing discovery, and in limiting cross-examination regarding a prior conviction. The Defendant also requests relief under a theory of cumulative error. After a thorough review of the record, we conclude that the Defendant is not entitled to a new trial, and we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ALAN E. GLENN, JJ., joined.

John M. Ballard, Nashville, Tennessee, for the appellant, Ralph Alan Stanley.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Assistant Attorney General; Glenn Funk, District Attorney General; and J. Wesley King, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTUAL AND PROCEDURAL HISTORY

The Defendant was convicted of aggravated assault for thrusting a knife toward the victim, Mr. David Williams, in the course of a confrontation on March 19, 2014,

causing the victim to reasonably fear imminent bodily injury. The State presented the testimony of the victim and of an eyewitness, both of whom testified that the Defendant followed the victim out of an apartment, confronted him to start a physical altercation, and produced a knife, causing the victim to flee. The State introduced testimony that the Defendant then began to send threatening text messages to the victim and came to the victim's home prior to being apprehended. During the Defendant's arrest, a knife was found in his vehicle. The Defendant introduced the testimony of two witnesses, both of whom testified that they did not see the Defendant with a knife during the confrontation and that the victim initiated or participated fully in the confrontation.

## Pretrial Proceedings

On the day of trial, the Defendant filed a number of motions addressing evidence which had recently come to light. During the preliminary hearing, the victim had given testimony regarding the threatening messages. The defense filed a motion in limine to exclude this evidence a few days before trial, and the State argued that the evidence was admissible as evidence of motive and intent and to explain the victim's delay in filing a police report. The trial court deferred ruling on the motion until the State could make an offer of proof through the victim, whose presence at trial was uncertain. During the weekend before trial, defense counsel was able to make contact with the victim regarding the messages, and the defense discovered the existence of a police report which had not been provided to the Defendant in discovery. Simultaneously with the discovery of the police report, the State located three 911 calls that had taken place in the early morning hours of March 20, 2014. Pursuant to a subpoena, the defense had obtained a recording of a 911 call made on March 19, 2014, after the aggravated assault, but the three additional calls did not come to light because they occurred on the following day.

The Defendant moved to exclude these 911 calls, and the State indicated that it did not intend to introduce them in its case-in-chief but would use them as rebuttal of the Defendant's proof if necessary. The first call was from a witness, Mr. Joshua Parks, who called 911 at approximately 12:17 a.m. to report that the Defendant had said that "he was on his way to kill somebody." Mr. Parks was not available to testify at trial, as he had not appeared despite the issuance of a subpoena. The second call was made at 12:21 a.m. by the victim's wife, who had not been listed on the indictment as a witness and was consequently not slated to testify at trial. The third call was made at 12:42 a.m. by Mr. Parks, who told the 911 operator that the Defendant was at his apartment and that Mr. Parks was afraid. The Defendant opposed the use of these calls on rebuttal because they had not been provided in discovery. The Defendant did not make a motion to continue the trial. The trial court noted that the State did not wish to introduce the evidence, that it was unlikely that the evidence would come in for rebuttal because the callers would not

be presented as witnesses at trial, and that rebuttal was by its nature extemporaneous. The trial court did not rule that the calls should be categorically excluded from rebuttal.

At the same hearing on the morning of trial, the Defendant moved to suppress the knife found in his car based on the late-provided second police report. The police report provided in discovery had described the knife as recovered in a "search incident to arrest." Defense counsel, in speaking to the victim, became aware of another police report, which described the knife as having been recovered from the Defendant's vehicle. At the hearing, Officer Keith Holley testified that he had a warrant for the Defendant's arrest for aggravated assault and that in the early morning hours of March 20, 2014, he located the Defendant in the parking lot of an apartment complex. The driver's side door of the Defendant's vehicle was open, and the Defendant was standing next to the car, leaning in. Officer Holley confirmed the Defendant's identification and determined that that the Defendant was not visiting anyone at the complex. He arrested the Defendant based on the warrant and also for trespassing. He returned to the vehicle to "secure" it, and on the driver's seat was a black folding knife which matched the description of the knife used in the assault. Officer Holley also found a "folding throwing star" on the Defendant's keys, which were also in the driver's seat. Officer Holley elaborated, "If you had walked up and the door was open, you would have seen the keys which had the throwing star on it and the knife." He testified that the vehicle was unlocked with the door open. Officer Holley took the knife and keychain into evidence and locked the car. He stated the Defendant was intoxicated but acknowledged that he did not charge the Defendant with driving under the influence of an intoxicant. The trial court denied the motion to suppress.

The Defendant also filed a motion seeking to exclude testimony regarding the threatening text messages. The State made an offer of proof through the victim, who testified that after the altercation, the Defendant called him and sent him text messages threatening to come to his home and harm the victim, his wife, and their children. The Defendant and victim were acquainted, and the Defendant knew where the victim lived. Although the victim did not initially contact the police, after receiving numerous threatening communications, the victim returned to the apartment complex where the assault took place and called the police from that location. An officer came to the scene to take a report and advised him to go to night court to obtain a warrant. The victim was "pretty sure" that he showed the text messages to the officer at the apartment, and he was certain he showed them to the commissioner when swearing out the warrant at night court. Officer William King, however, testified that he was the responding officer and that he did not recall being shown any text messages. He testified that he would have put the text messages in his report and would have preserved them.

The victim testified that after he had gone to night court to obtain the warrant, the Defendant drove up the victim's street, parked his car approximately one hundred yards away, and then walked to the victim's house. The victim called the police while the Defendant walked around the side and front of the home for approximately ten minutes. A different officer came to the victim's home regarding the incident, and the victim did not show this officer the text messages. The victim no longer had either the messages or the telephone.

The trial court ruled that the text messages were admissible under Tennessee Rule of Evidence 404(b) because they were closely related to the assault, were probative of motive and intent, and explained the delay in contacting police. The trial court found that Officer Holley's testimony that he did not recall the messages "doesn't mean it didn't happen." The court concluded that the probative value was "extremely high," that the messages were not particularly prejudicial, and that testimony about the messages was admissible.

**Trial Proceedings**

At trial, the victim testified that he worked as a mechanic and that the Defendant was an acquaintance who had assisted him on some work-related projects. Despite their past relationship, the victim was not on good terms with the Defendant because of "situations that happened while we were working together." The victim was "ready to sever ties" with the Defendant and did not "want to have any conversations, relations, or anything further to do with" with the Defendant.

On March 19, 2014, the victim arrived at Mr. Parks's apartment at around 7:30 p.m., delivering a dresser for a friend. At the apartment were the friend who owned the dresser, the Defendant, Mr. Parks, and Ms. Tracy[1] Parks, who was Mr. Parks's sister and the Defendant's girlfriend at the time. When the victim and his friend arrived, the Defendant tried to start a conversation with the victim, but the victim told the Defendant he did not want to speak with him. The Defendant began to "get upset," and he got "pretty aggravated" and "hostile" when the victim was willing to speak in reply to something Ms. Parks said.

The victim testified that he left the apartment to retrieve the remaining pieces of the dresser and that the Defendant followed him. As they walked, the Defendant placed his hand on the victim's shoulder, and the victim told him "to get his hand off of me." The victim testified that the Defendant then pulled a knife out of his pocket and made a statement about getting "into a physical altercation." When the victim saw the knife, he

---

[1] Ms. Parks's first name is also spelled "Tracey" in the record.

- 4 -

asked the Defendant to put it away. Instead, the Defendant swung the knife at the victim and "kicked at" him. The victim testified that he blocked the kick and got away. According to the victim, he asked the Defendant to put the knife away, and the Defendant did so briefly. The Defendant then produced the knife again, said, "I'm going to gut you like a pig," and "came after" the victim. When the victim saw the Defendant chasing him with a knife, he ran away. The victim testified that he was not armed and that he fled to avoid getting cut. He did not feel threatened "until there was a knife blade in [the Defendant's] hand." The victim said that once he was a safe distance from the Defendant, he turned around and threw his keys to Mr. Parks, asking Mr. Parks to either take his car home or to come get him. The victim intended to run to his house, which was under two miles away, but Mr. Parks picked him up in the victim's vehicle after he had run about one hundred yards. The victim identified the knife recovered from the Defendant's vehicle as consistent with that used by the Defendant.

The victim acknowledged he had told other people he blocked the Defendant's kick, and he testified that he had obtained a black belt in taekwondo when he was a child. He also acknowledged he might have said he could "take [the Defendant] with one had behind [his] back" and that at one point he told the Defendant he was not going to run away from him. He testified that he never turned his back on the Defendant while the Defendant had the knife out but did briefly turn around when the Defendant had placed the knife back into his pocket. The victim acknowledged that while he had told the Defendant he did not want to fight, he also said, "[I]f you put your hands on me, it could be different." The victim did not recall knocking down Ms. Parks as he ran away, but acknowledged that he had "heard" that either he or the Defendant bumped into her. He testified that he did not know Ms. Dalena Reynolds and that he did not believe Mr. Harvey Bush was present.

The victim testified that shortly after leaving, he began to receive calls and "threatening text messages" on his cellular telephone from the Defendant. The victim elaborated that in the messages, the Defendant stated that he "was going to come to my house and harm me and my family." The victim's wife was afraid, and about thirty minutes after the assault, the victim returned to the apartment complex, went to the apartment of Ms. Glennis Key, called the police, and met an officer at the scene. He explained that he went back to the complex because the assault had occurred there and he believed, from the Defendant's text messages, that the Defendant was no longer there. He testified that he did not recall if he showed the officer the text messages but was sure he had shown them when he went to get a warrant in night court. He acknowledged having said earlier that he was "pretty sure" he showed the officer the messages.

The victim stated that he then obtained a warrant in the company of Mr. Parks. When the victim returned home, the Defendant drove up the road and walked to the victim's home, "lurking around" while the victim called the police.

Officer Holley testified at trial about apprehending the Defendant at the apartment complex. He reiterated that the Defendant left the car door open and that a black folding knife and a throwing star were on the driver's seat.

Ms. Glennis Key confirmed the victim's testimony that the Defendant had attacked him with a knife. Ms. Key testified that she lived in the apartment complex, upstairs from Mr. Parks, and was slightly acquainted with the victim through Mr. Parks. On the day of the assault, Mr. Parks called her and asked her to help him manage an argument brewing between the victim and the Defendant. The Defendant was "cussing and going off," and the victim did not want to talk to the Defendant. Ms. Key confirmed that the Defendant followed the victim outside, and she testified that "[e]veryone" followed. The two were arguing, and the Defendant reached into his pocket, "popped" the knife, and started running after the victim. Ms. Key shouted for the victim to run, "so [the Defendant] wouldn't stick him with the knife," and the victim fled. The Defendant was intoxicated and could not catch the victim. She confirmed that the victim called the police from her apartment later; Mr. Parks was also present for the call. She also testified that the Defendant came to her apartment and started beating on the door immediately before his arrest.

Ms. Key testified she was not aware that Mr. Parks had a roommate. She recalled that the victim "accidentally" knocked down Ms. Parks. She acknowledged discussing the incident with the victim and Mr. Parks prior to calling the police. She also acknowledged that she had pled guilty in 2014 to aggravated assault but denied she was guilty of the charge.

The Defendant presented the testimony of two witnesses who saw no knife during the confrontation. Ms. Dalena Reynolds testified that she was Mr. Parks's roommate at the time of the confrontation. According to Ms. Reynolds, five to six people were in the apartment, and she heard the victim and the Defendant arguing. She testified that both were arguing and that the victim was speaking to the Defendant. When she came into the living room, the victim asked the Defendant to step outside, and the victim went out, followed by the Defendant and the others, who were going "[t]o watch a fight." The two men faced each other, and the Defendant threatened to call the victim's wife to "report some whatever." The Defendant produced a cellular telephone, and the victim then ran off. Although "somebody yelled" the word "knife," she had a good view and did not see a knife. Ms. Reynolds testified that the victim was "[e]gging it on" and "blowing it out of proportion." Ms. Reynolds saw the victim trip and fall into Ms. Parks as he fled. She

testified that at the time, she did not know either man but that the Defendant was her friend at the time of trial.

Mr. Harvey Bush testified that he was at Mr. Parks's home when the victim arrived and that the victim helped Mr. Bush get a dresser out of a woman's car. The Defendant and his girlfriend arrived soon after the victim. The victim refused to speak to the Defendant but spoke to the Defendant's fiancée, Ms. Parks. The victim "said he was going to smack" the Defendant, and Mr. Parks asked them to "take it outside." Outside, the victim took off his cowboy boots and attempted to tie one of his hands behind his back in preparation for a fight. He informed those present that he was a black belt and was "doing all of the talking." The victim then looked at the Defendant, said, "[Y]ou got a knife," and fled, knocking over Ms. Parks. Mr. Bush never saw a knife. Mr. Bush testified that the people present outside were himself, the Defendant, the victim, Ms. Parks, and possibly one other person. Mr. Parks was inside the house. Mr. Bush left because he believed that an ambulance was being called for Ms. Parks and he did not want to be involved. He acknowledged having been convicted of theft and evading arrest.

Prior to trial, the defense had indicated that it wished to cross-examine the victim regarding two prior theft convictions and a conviction for facilitation of especially aggravated burglary. The trial court ruled that the convictions were admissible for impeachment. When the Defendant indicated he wished to explore the factual circumstances of the burglary, the trial court told him he could not "do that," and defense counsel agreed, "I don't think so, either." On the morning of trial, the defense again broached the admissibility of the facts surrounding the burglary conviction, which defense counsel stated involved "us[ing] a woman to gain entry into the home." The trial judge stated he would "get the jury picked and then we will deal with all of that." Defense counsel asked the victim about his prior theft convictions, and the victim ultimately agreed that he was convicted twice of theft. The burglary charge was not initially mentioned, but defense counsel was permitted to recall the victim. At that time, he asked the victim if he had entered a guilty plea to facilitation of especially aggravated burglary and noted that serious bodily injury was an element of the offense. The victim acknowledged the conviction.

The jury convicted the Defendant of aggravated assault, and the trial court sentenced him to serve ten years on probation. The trial court denied the Defendant's motion for a new trial, and the Defendant appeals.

- 7 -

# ANALYSIS

On appeal, the Defendant asserts that the evidence was insufficient to uphold the verdict. He also contends that the trial court erred in failing to suppress the knife, in allowing testimony about the text messages, in allowing evidence of the 911 calls, and in limiting cross-examination regarding the victim's prior conviction. He also premises relief on cumulative error.

## I. Sufficiency of the Evidence

The Defendant challenges the sufficiency of the evidence based on the conflicts in testimony at trial and on the contention that the victim was not afraid. This court must set aside a conviction if the evidence is insufficient to support the finding of guilt beyond a reasonable doubt. Tenn. R. App. P. 13(e). In evaluating sufficiency of the evidence, the question before the appellate court is whether, after reviewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Pope*, 427 S.W.3d 363, 368 (Tenn. 2013). This court will not reweigh or reevaluate the evidence, and it may not substitute its inferences drawn from circumstantial evidence for those drawn by the trier of fact. *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004). A jury's verdict of guilt, approved by the trial court, resolves conflicts of evidence in the State's favor and accredits the testimony of the State's witnesses. *State v. Smith*, 436 S.W.3d 751, 764 (Tenn. 2014). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). "This Court affords the State the strongest legitimate view of the evidence presented at trial and the reasonable and legitimate inferences that may be drawn from the evidence." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012). A guilty verdict replaces the presumption of innocence with one of guilt, and on appeal, the defendant bears the burden of demonstrating that the evidence is insufficient to support the conviction. *State v. Cole*, 155 S.W.3d 885, 897 (Tenn. 2005).

A conviction for aggravated assault, as charged here, required the State to prove that the Defendant intentionally or knowingly caused the victim to reasonably fear imminent bodily injury through the use or display of a deadly weapon, in this instance, a knife. T.C.A. §§ 39-13-102(a)(1)(A)(iii) (2013); 39-13-101(a)(2).

The Defendant argues that the evidence is insufficient to support the verdict because the cumulative testimony of the witnesses does not support the conclusion that the Defendant had a knife and because the victim did not actually exhibit fear. The Defendant points to the victim's testimony that he turned his back on the Defendant, that

he merely asked the Defendant to put the knife away, that he told the Defendant he would not run, and that he told the Defendant that while he had not come to fight, "[I]f you put your hands on me, it could be different."

These arguments merely amount to a disagreement with the jury's weighing of the credibility of witnesses and the jury's decision to accredit certain testimony. Both the victim and Ms. Key testified that the Defendant produced a knife during a confrontation. All four eye witnesses agreed that the victim suddenly fled and that there were allegations at the time that a knife was used. A knife was recovered from the Defendant's vehicle. While Ms. Reynolds testified that the Defendant was holding a cellular telephone and not a knife and Mr. Bush testified that he did not see anything in the Defendant's hand, the jury was free to disbelieve their testimony. There is evidence from which a rational trier of fact could conclude that the Defendant was armed with a deadly weapon. Likewise, the evidence supports the inference that the victim was afraid of imminent serious bodily injury. While the victim acknowledged turning his back on the Defendant and initially making statements that he did not plan to flee, the victim also stated that he ultimately ran to avoid getting cut and that he felt threatened once the Defendant had a knife in his hand. Ms. Key confirmed that the victim fled "so [the Defendant] wouldn't stick him with the knife." A rational trier of fact could have found that victim reasonably feared imminent bodily injury. The evidence is sufficient to uphold the verdict.

## II. Motion to Suppress

The Defendant asserts that the trial court erred in denying the motion to suppress the knife which was found in the Defendant's vehicle, arguing primarily that Officer Holley was not entitled to search the vehicle incident to the Defendant's arrest. The State responds that the knife was in plain view and that Officer Holley was justified in seizing it.

A trial court's factual determinations made in deciding a motion to suppress will be upheld on appeal unless the evidence preponderates otherwise. *State v. Williamson*, 368 S.W.3d 468, 473 (Tenn. 2012). Determinations regarding the credibility of witnesses, the weight or value of the evidence, or conflicts in the evidence are matters entrusted to the trial judge as the trier of fact. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). "The prevailing party in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." *State v. Day*, 263 S.W.3d 891, 900 (Tenn. 2008). An appellate court may consider the entire record, including the evidence adduced at trial, in reviewing the trial court's determination regarding the suppression of the evidence. *Williamson*, 368 S.W.3d at 473.

Both the Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution protect against unreasonable searches and seizures. *State v. Echols*, 382 S.W.3d 266, 277 (Tenn. 2012). The prohibition against unreasonable searches and seizures afforded by the federal and state constitutions is accompanied by the general rule that a warrantless search or seizure is presumed unreasonable and that any evidence discovered through such a search is subject to suppression. *Day,* 263 S.W.3d at 901.

The warrant requirement is subject to certain "well-delineated" and "jealously and carefully drawn" exceptions. *State v. Richards*, 286 S.W.3d 873, 878 (Tenn. 2009) (quoting *Day,* 263 S.W.3d at 901). These include searches incident to arrest, plain view, exigent circumstances, and consent to search. *State v. Talley*, 307 S.W.3d 723, 729 (Tenn. 2010). "In the determination of whether a search or seizure meets constitutional standards, the first consideration … is whether the accused has a reasonable expectation of privacy." *Id.* at 730.

When evidence is in plain view, it may be seized without a warrant. *Id.* at 729. For the plain view doctrine to apply, (1) the items seized must be in plain view; (2) the viewer must have a right to be in the position from which the items were viewed; and (3) the incriminating nature of the items must be immediately apparent. *State v. Cothran*, 115 S.W.3d 513, 524-25 (Tenn. Crim. App. 2003). The incriminating nature of an object is immediately apparent if the police have probable cause to believe it constitutes evidence or contraband. *State v. William T. Davis*, No. M2004-03060-CCA-R3-CD, 2005 WL 2255968, at *9 (Tenn. Crim. App. Sept. 15, 2005) (holding that officers had probable cause to believe animals were the victims of cruelty and could therefore seize the animals); *see Arizona v. Hicks*, 480 U.S. 321, 326 (1987) (holding that probable cause is required to invoke the plain view doctrine). "[E]xtensive, and often noncriminal contact with automobiles will bring local officials in 'plain view' of evidence, fruits, or instrumentalities of a crime, or contraband." *Cady v. Dombrowski*, 413 U.S. 433, 442 (1973).

In this case, Officer Holley testified that when he stopped to execute an arrest warrant on the Defendant, the Defendant was leaning in through the open door of his vehicle, with the keys and the knife on the driver's seat. After Officer Holley arrested the Defendant pursuant to the warrant, he returned to the vehicle to secure it and saw the items in plain view from his vantage point in a public parking lot. Officer Holley was aware that the aggravated assault was perpetrated with a knife and accordingly had probable cause to believe the knife on the seat was evidence. The knife was properly seized according to the plain view doctrine, and the trial court did not err in denying the motion to suppress. *See State v. Carrie Lynn Ronewicz*, No. W2011-01332-CCA-R3-CD, 2012 WL 6719646, at *18 (Tenn. Crim. App. Dec. 26, 2012) (incriminating nature of

items was immediately apparent because victim identified them as stolen items); *State v. Brian Herman Dowdy*, No. W2000-01011-CCA-R3-CD, 2001 WL 91732, at *5 (Tenn. Crim. App. Jan. 26, 2001) (holding that plain view doctrine applied to beer bottles observable from the outside of the defendant's vehicle where the items were in plain view, the officer had a right to be at the defendant's vehicle, and the incriminating nature of the items was immediately apparent).

### III. Testimony Regarding Text Messages

The Defendant asserts that the victim's testimony regarding the threatening text messages should have been excluded as unduly prejudicial and that it violates the "best evidence" rule. The State counters that the trial court did not abuse its discretion in admitting the testimony.

### A. Admissibility Under Tennessee Rule of Evidence 404(b)

Generally, relevant evidence is admissible at trial. Tenn. R. Evid. 402. Evidence that has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence" is relevant. Tenn. R. Evid. 401. However, relevant evidence may be excluded when "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. The Defendant's argument appears to be primarily that the trial court erred in weighing the probative value of the evidence against the danger of unfair prejudice under Rule 403.

We note initially that the evidence at issue constitutes proof of "other crimes, wrongs, or acts" under Tennessee Rule of Evidence 404(b). The trial court, in admitting the evidence, noted that the evidence was admissible under Rule 404(b) as evidence of prior bad acts.

Character evidence – including evidence of other crimes or bad acts admitted for the purpose of showing action in conformity with a bad character trait – is generally not admissible. Tenn. R. Evid. 404(b). Evidence of prior bad acts may, however, be admissible for a purpose other than proving character, such as "(1) motive; (2) intent; (3) guilty knowledge; (4) identity of the defendant; (5) absence of mistake or accident; (6) a common scheme or plan; (7) completion of the story; (8) opportunity; and (9) preparation." *State v. Berry*, 141 S.W.3d 549, 582 (Tenn. 2004) (appendix); *State v. Gilliland*, 22 S.W.3d 266, 271 n.6 (Tenn. 2000) (listing as potential material issues: "motive of the defendant, intent of the defendant, the identity of the defendant, the absence of mistake or accident if that is a defense, the existence of a larger continuing

plan, scheme, or conspiracy of which the crime on trial is a part," and possibly completion of the story).

The Rule requires the trial court to adhere to a particular procedure in making a ruling under Rule 404(b):

> (1) The court upon request must hold a hearing outside the jury's presence;
>
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
>
> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
>
> (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). In general, a court should take a restrictive approach to admitting evidence under Rule 404(b) because of the potential that the jury will be unfairly influenced. *State v. Dotson*, 450 S.W.3d 1, 76 (Tenn. 2014). "'Prejudice becomes unfair when the primary purpose of the evidence at issue is to elicit emotions of bias, sympathy, hatred, contempt, retribution, or horror.'" *State v. Young*, 196 S.W.3d 85, 106 (Tenn. 2006) (quoting *State v. Collins,* 986 S.W.2d 13, 20 (Tenn. Crim. App. 1998)). The danger of unfair prejudice is increased if the prior bad act was similar to the crime at issue at trial. *State v. Adams*, 405 S.W.3d 641, 659 (Tenn. 2013).

When a trial court has substantially complied with the procedures of Rule 404(b), this court will only reverse the admission of evidence if there has been an abuse of discretion. *State v. Hawkins*, 519 S.W.3d 1, 45 (Tenn. 2017). The trial court's decision is afforded no deference when there is not substantial compliance with the "strict procedural requirements," and the appellate court may then determine admissibility. *State v. DuBose*, 953 S.W.2d 649, 652-53 (Tenn. 1997).

Here, the Defendant does not analyze the admissibility of the evidence Rule 404(b) but instead argues that the trial court erred in weighing the probative value of the evidence against the danger of unfair prejudice under Rule 403. We note that the standard in Rule 404(b) is more restrictive than the general standard in Rule 403, in that Rule 404(b) requires only that the probative value of the evidence be "outweighed" by

- 12 -

the danger of unfair prejudice not that it be "substantially outweighed." The trial court's substantial compliance with Rule 404(b) implicates our standard of review, and we examine whether the trial court erred in admitting the evidence under Rule 404(b).

The trial court conducted a hearing outside the presence of the jury and determined that the Defendant's subsequent acts of threatening the victim and coming to the victim's home were relevant to material issues other than character: the Defendant's motive or intent to commit the crime, in that it showed his animosity to the victim, and completion of the story, in that the victim delayed contacting police until the Defendant made further threats against him and his family. The jury was instructed to consider evidence of the acts only insofar as they "complete[d] the story of the alleged crime" and bore on the Defendant's intent.

The trial court found that the probative value was "extremely high" and that the probative value was not outweighed by danger of unfair prejudice. While the trial court did not make an explicit finding that the evidence was established by "clear and convincing evidence," the trial court did comment on the proof presented, noting that although Officer King did not recall being shown the text messages, "that doesn't mean that the texts and/or threats didn't happen." The trial court noted that the victim testified that some of the threats were oral and that there would be no physical evidence of oral threats. Furthermore, the victim did not state definitively that he showed the text messages to the officer who took the police report. We conclude that, although it would have been preferable for the trial court to use the phrase "clear and convincing evidence," the record supports the conclusion that the trial court, referring to Rule 404(b), weighed the credibility of the testimony and found that the victim's statements about the threats amounted to clear and convincing evidence. *State v. Michael Bailey*, No. W2005-01815-CCA-R3-CD, 2007 WL 763212, at *5 (Tenn. Crim. App. Mar. 13, 2007) ("While the trial court did not explicitly find that the proof of the other crime was clear and convincing, that finding is implicit in the trial court's explanation for allowing the testimony [of the witness]."); *compare State v. Sexton*, 368 S.W.3d 371, 404 (Tenn. 2012), *as corrected* (Oct. 10, 2012) (noting that the trial court had an obligation to state on the record whether the bad act was proven by clear and convincing evidence). The trial court's factual findings regarding evidence of the bad acts constitute "substantial compliance" with the statute. *DuBose*, 953 S.W.2d at 652.

We conclude that the trial court did not abuse its discretion in admitting the testimony because it was relevant to material issues other than the Defendant's character and because its probative value was not outweighed by the danger of unfair prejudice.

Although the Defendant objects that the threats took place after the assault, "Rule 404(b) would permit the introduction of evidence of subsequent acts to establish one's

- 13 -

intent during a prior act in appropriate cases." *State v. Elkins*, 102 S.W.3d 578, 584 (Tenn. 2003). Accordingly, we conclude that the trial court did not abuse its discretion in admitting the evidence.

## B. Best Evidence Rule

The Defendant next contends that oral testimony about the contents of the text messages should not have been permitted because it violates the "best evidence rule." He acknowledges that this issue was not raised below and asks for plain error review. For an error to constitute plain error sufficient to merit relief, the following factors must be present: a) the record must clearly establish what occurred in the trial court; b) a clear and unequivocal rule of law must have been breached; c) a substantial right of the accused must have been adversely affected; d) the accused did not waive the issue for tactical reasons; and e) consideration of the error is necessary to do substantial justice. *State v. Bishop*, 431 S.W.3d 22, 44 (Tenn. 2014) (citing *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). Additionally, "the plain error must be of such a great magnitude that it probably changed the outcome" of the proceeding. *Bishop*, 431 S.W.3d at 44 (quoting *Adkisson,* 899 S.W.2d at 642). This court need not consider all the factors if it is clear that the defendant will fail to establish at least one. *State v. Jordan*, 325 S.W.3d 1, 58 (Tenn. 2010).

We conclude that the Defendant is not entitled to plain error relief because he cannot show that a clear and unequivocal rule of law was breached. The Defendant relies on Tennessee Rule of Evidence 1002, which states that, "[t]o prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required, except as otherwise provided in these rules or by Act of Congress or the Tennessee Legislature." Tenn. R. Evid. 1002. The Defendant argues that the testimony regarding the messages should not have been admitted because the original was not offered into evidence.

However, the Defendant acknowledges that the original of a writing is not required if "[a]ll originals are lost or destroyed, unless the proponent lost or destroyed them in bad faith." Tenn. R. Evid. 1004(1). There is no allegation that the messages were destroyed in bad faith. Furthermore, if "[a]t a time when an original was under the control of the party against whom offered, that party was put on notice by the pleadings or otherwise that the contents would be a subject of proof at the hearing," other evidence may establish the content. Tenn. R. Evid. 1004(2). The Defendant objects that he did not know about the State's intent to include testimony regarding the messages until the eve of trial. However, the record establishes that the victim testified regarding threatening messages at the preliminary hearing on March 25, 2014, when the Defendant himself would have had access to any electronic communications between the two. Accordingly,

- 14 -

the admission of other evidence regarding the text messages did not violate any clear and unequivocal rule of law.

The Defendant also objects to the vagueness of the victim's testimony regarding the content of the messages. The victim testified that he could not remember the exact wording of the messages but recalled that they contained threats toward himself and his family. The Defendant cites to no authority that the victim's testimony was rendered incompetent because he could not remember the exact wording of the threats. Accordingly, the Defendant is not entitled to relief.

## IV. Recorded Calls to 911

The Defendant asserts that the trial court erred when it refused to exclude from rebuttal the three 911 recordings which had not been produced until the weekend before trial. The State asserts that the prosecution produced the evidence, that the Tennessee Rules of Criminal Procedure did not require disclosure of the calls, and that the Defendant failed to demonstrate prejudice.

On April 22, 2016, the Defendant, through the court clerk, issued a subpoena to the Emergency Communications Center for: "The 911 recordings involved in this case which occurred on 3/19/2014 around 9 PM from David Williams or any other individuals calling about the incident at [the apartment complex]." While the 911 call from the requested date was produced, the prosecutor, on the weekend before trial, discovered three additional calls to 911 which took place in the early morning hours of the next day. The Defendant asserts that the State had a continuing duty to disclose these calls and that the failure to produce them earlier violated Tennessee Rule of Criminal Procedure 16 and his right to present a defense.

Two of the calls were from Mr. Parks, and one was from the victim's wife; neither was a witness at trial. The first call was from Mr. Parks to report that the Defendant had said that "he was on his way to kill somebody." The second call was from the victim's wife. The third call was from Mr. Parks, who reported that the Defendant was at his home. None of the calls were entered into evidence.

Under Tennessee Rule of Criminal Procedure 16,

> (F) Documents and Objects. Upon a defendant's request, the state shall permit the defendant to inspect and copy or photograph books, papers, documents, photographs, tangible objects, buildings, or places, or copies or portions thereof, if the item is within the state's possession, custody, or control and:

(i) the item is material to preparing the defense;

(ii) the government intends to use the item in its case-in-chief at trial; or

(iii) the item was obtained from or belongs to the defendant.

Tenn. R. Crim. P. 16(a)(1)(F). In the event of a violation, the Rule provides that the trial court may order discovery or inspection, grant a continuance, exclude the evidence, or take other remedial measures. Tenn. R. Crim. P. 16(d)(2). While the State did not intend to use the calls in its case-in-chief, the Defendant asserts that the calls should have been produced as material to the defense because of their relevance to the subsequent events testified to at trial, including the Defendant's "lurking" around the victim's home and the circumstances of the Defendant's arrest. The Defendant asserts his counsel spent valuable time addressing the new evidence on the eve of trial and that this negatively affected his ability to prepare a defense. He also asserts he was wary of cross-examining Ms. Key and of testifying for fear of opening the door to the admission of the calls.

The Rule requires the State to produce discovery "[u]pon a defendant's request." However, the record here does not include a motion for discovery filed by the Defendant or a request to the State to produce any recordings of the 911 calls. Instead, the record shows that the Defendant issued a subpoena for the calls which, in retrospect, was inartfully worded in that it did not include all relevant dates. It appears that the prosecution informed the defense of the additional 911 calls when the prosecutor discovered them during the weekend before trial. We note that "[t]he prosecution is not required to disclose information that the accused already possesses or is able to obtain." *State v. Marshall*, 845 S.W.2d 228, 233 (Tenn. Crim. App. 1992). Given the record on appeal, it appears that the State did not violate the discovery rules because it disclosed the evidence prior to trial, as soon as the prosecutor became aware of the calls.

Moreover, even if the State's conduct constituted a discovery violation, the Defendant has not demonstrated prejudice. Because the calls were never introduced into evidence, the Defendant cannot show that the trial court's ruling caused him prejudice. *See Hawkins*, 519 S.W.3d at 57 (appendix) (concluding that even if the State committed a discovery violation, the marginal relevance of admitted photographs negated prejudice). The Defendant asserts that the materials impeded his trial preparation and should have been categorically excluded, but "[g]enerally speaking, the exclusion of the evidence is a drastic remedy and should not be implemented unless there is no other reasonable alternative." *State v. Smith*, 926 S.W.2d 267, 270 (Tenn. Crim. App. 1995). "A trial court has wide discretion in fashioning a remedy for non-compliance with a discovery

order, and the sanction should fit the circumstances of the case." *State v. Downey*, 259 S.W.3d 723, 737 (Tenn. 2008). The Defendant never asked for a continuance, which he acknowledged was a tactical decision based on the possibility that a delay could result in the presentation of additional witnesses and the introduction of the calls into the State's case-in-chief. He has not shown error or prejudice. We note that the Defendant's parenthetical assertion that he is entitled to relief based on the police report which was produced late and not introduced at trial also fails because the report was ultimately produced, it was not entered into evidence, and the Defendant did not request additional time to prepare for trial. *See* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.").

### V. Cross-Examination

The Defendant asserts that the trial court erred in limiting him to asking two questions regarding the victim's conviction for facilitation of especially aggravated burglary: whether the victim had pled guilty to the crime and whether the crime involved "gaining access to someone's home resulting in serious bodily injury with the purpose of committing a theft." The State counters that the issue is waived because the Defendant has failed to prepare a record which shows that cross-examination was limited. The Defendant acknowledges that the trial court's "final ruling is absent from the transcript."

We note initially that the State is incorrect to assert that the record does not contain a transcript of the pretrial hearing on this issue conducted on the Friday before trial. Instead, in addition to numerous other technical errors in the transcriptions, this transcript has been mislabeled as the "Transcript of the Motion for a New Trial." At the pretrial hearing, the Defendant expressed his desire to delve into the facts surrounding the victim's prior conviction. The court told defense counsel that he could not "do that," to which defense counsel responded, "I don't think so, either." The trial court told defense counsel that it would consider any contrary law that the defense could provide on the Monday of trial but that under Tennessee Rule of Evidence 609, the defense would be limited to the fact of conviction and the nature of the felony. On the day of trial, the Defendant reiterated that he wanted to introduce the facts of the conviction, and the trial court indicated that it would "deal with all of that" after jury selection. The record contains nothing further related to the issue until the Defendant cross-examined the victim about the crime, asking only the two questions regarding the fact of his conviction and the nature of the crime.

We conclude that, even if we were to determine that the trial court's Friday ruling definitively excluded other questions about the victim's conviction and that the issue was

consequently not waived, the Defendant has not shown he is entitled to relief. Under Tennessee Rule of Evidence 609, a witness's credibility may be attacked by certain prior convictions. "A witness may be impeached by evidence of a prior conviction of a crime if the crime involves dishonesty or false statement or if the crime is punishable by death or by one year or more in prison." *State v. Russell*, 382 S.W.3d 312, 315 (Tenn. 2012). However, evidence of a prior conviction under Tennessee Rule of Evidence 609 "is limited to the fact of a former conviction and the crime that was committed." *State v. Taylor*, 993 S.W.2d 33, 34 (Tenn. 1999); *see State v. Morgan*, 541 S.W.2d 385, 389 (Tenn. 1976). The Defendant cites to *State v. Dishman*, 915 S.W.2d 458, 463-64 (Tenn. Crim. App. 1995), which held that a witness's prior involvement with a crime could be introduced under Rule 608 when the witness did not have a conviction because she had successfully completed pretrial diversion. However, as *Dishman* notes, "[p]rior convictions are governed by Rule 609." *Dishman*, 915 S.W.2d at 463. Accordingly, the trial court did not err in limiting impeachment under Rule 609, and the Defendant is not entitled to relief.

## VI. Cumulative Error

The doctrine of cumulative error recognizes that "there may be multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." *State v. Hester*, 324 S.W.3d 1, 76 (Tenn. 2010). Because cumulative error is only applicable where the accused has established there was more than one error committed, the Defendant cannot premise relief on this theory. *Id.* at 77.

## CONCLUSION

Based on the foregoing analysis, we affirm the judgment of the trial court.

_____
JOHN EVERETT WILLIAMS, JUDGE